Filed 8/7/19; Certified for partial publication 9/5/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NICOLE DELISI et al.,<br><br>        Plaintiffs and Respondents,<br><br>v.<br><br>COLLIN LAM et al.,<br><br>        Defendants and Appellants. | A151014<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-15-547092) |

Respondents Nicole DeLisi and Leon Pitre were served with an eviction notice after new owners purchased the four-unit building in which they rented an apartment. Believing that the owners were violating the local rent control ordinance because their purported reason for the eviction was a pretext for the true motivation of increasing the rental value of the unit, DeLisi and Petri sued, together with the former tenant of another unit who had been evicted previously. The jury returned a verdict in favor of DeLisi and Petri. The owners contend the judgment must be reversed because the relative move-in provisions of the rent control ordinance are unconstitutionally vague, no substantial evidence supports the jury's finding that they violated the rent control ordinance, the claims are barred by the litigation privilege, and the damages award was based on an erroneous standard and is not supported by substantial evidence. We affirm.

**BACKGROUND**

In June 2014, appellants Collin Lam and Kimberly Wong purchased the four-unit building at 4441 Balboa Street in San Francisco. The building was subject to the San Francisco Residential Rent Stabilization and Arbitration Ordinance (Rent Ordinance)

(codified as S.F. Admin. Code, ch. 37), and tenants occupied each of the four units. William Randt had lived in unit 2 since August 2008, and paid $1,370.18 per month in rent. Nicole DeLisi had lived in unit 1 since September 2013, and paid $1,455 per month in rent; Leon Pitre had moved into the unit with her in January 2014. Unit 3 was occupied by George Chan, and unit 4 by tenants who held protected status under the Rent Ordinance and paid monthly rent of $779.47. Lam sent the tenants a letter introducing himself as the new owner of the building and requesting that rent payments be sent to his address at 279 11th Avenue.

On June 18, 2014, Lam served Randt with a "60 Day Notice of Termination of Tenancy" pursuant to section 37.9, subdivision (a)(8), of the Rent Ordinance, so that appellants could move into unit 2.

On August 1, 2014, Chan gave notice of his intent to vacate unit 3. Randt asked Lam to rescind his eviction, but Lam declined. Randt moved out of the building on August 4 and Chan moved out on August 25. After Chan left, Lam painted and refinished the wood floor of unit 3 and in mid-September, rented it for more than the rent Chan had been paying.

In September 2014, DeLisi's rent check bounced and Lam had her served with a 30-day notice to pay rent or quit. DeLisi testified that Lam had verbally agreed she could pay her September rent with her October rent because she was not going to be paid until the end of September. DeLisi paid the owed rent and Lam rescinded the notice. Shortly thereafter, Lam asked DeLisi if she was thinking about moving out and she said she was not. On September 30, 2014, Lam gave DeLisi notice of a rent increase to $1,469.55, effective November 1, 2014, pursuant to the Rent Ordinance.

Appellants remodeled unit 2, making the one-bedroom, one-bath, apartment into a two-bedroom, two-bath, in anticipation of having a family. Lam informed the tenants by letter dated October 1, 2014, that construction would begin the next day, with a target completion date of December 2014. The letter stated, "Kimi and I look forward to becoming your neighbors before the end of the year!" The contractor's work took six to eight weeks, finishing at the end of November.

2

Appellants Lam and Wong testified that they moved into unit 2 in December 2014. As will be described, respondents presented evidence suggesting appellants did not move in until July 2015 or later.

On June 11, 2015, DeLisi and Pitre were served with a 60-day notice of termination of tenancy stating appellants' intention to have Wong's brother, Jordan Wong, move into the unit. The next day, Lam texted DeLisi, inviting her to let him know if she wanted to meet regarding the notice. She responded with a text message stating she was "overwhelmed with grief by how your greed for money and power affects the lives of those such as teachers that put their heart and soul into making this world a better place only to be counteracted by selfish people like yourself that destroy our communities."

DeLisi and Pitre investigated their rights and learned that the owner was supposed be living in the building in order to evict them for a relative move-in. They believed appellants were not living in the building when the eviction notice was served and, therefore, that the eviction was unlawful. They did not move out. DeLisi contacted Randt, and she, Pitre, and Randt filed the present lawsuit against defendants on July 29, 2015. On August 12, 2015, appellants filed an unlawful detainer action against DeLisi and Pitre, which ended with a settlement in October 2015 that allowed Pitre and DeLisi to remain in unit 1 until July 2016.

Trial in the present case began on July 26, 2016. Alleging claims for violation of the owner move-in and relative move-in provisions of the Rent Ordinance, intentional infliction of emotional distress and intentional misrepresentation, respondents' theory was that both appellants' own move into unit 2 and Jordan Wong's move into unit 1 were actually motivated by appellants' desire to recover possession of the apartments from the rent-controlled tenants in order to rent them at market rates in the future.[1]

Appellants testified that they had been raised in the Richmond District and wanted to live near family. Wong's parents live at 9th Avenue and Balboa, about 30 blocks from

---

[1] The case was dismissed as to Jordan Wong during trial, on August 1, 2016,

3

the building Lam and Wong purchased, and Lam had aunts and a grandmother living at 23rd Avenue, 33rd Avenue and 38th Avenue. Appellants had tried unsuccessfully to buy a single family home in the Richmond in 2008. They had previously lived in an apartment at 279 11th Avenue, a building in which some of Wong's relatives lived that was two blocks from Wong's parents' house, then bought a condominium on Folsom Street where they lived from 2010 to 2014. When they purchased the Balboa building, they were living in a different apartment in the building at 279 11th Avenue, having moved back in order to live close to Wong's parents. A tenant rented the condominium, but appellants kept a parking space at the Folsom Street building and a key fob for the building. Wong learned about the Balboa building after Lam made an offer on it.

Lam testified that appellants chose to move into unit 2 because a ground-floor unit would be easier to manage with groceries and a baby and for grandmothers to visit, and because this apartment had two storage units. When appellants moved in, they covered the windows of the apartment with newspaper because they realized they were "exposed." The newspaper remained until at least August 2015 or, according to some evidence, at least November 2015.[2] Wong testified that the newspapers did not bother her because she preferred to be more "covered than exposed," and that they eventually replaced the newspaper with temporary paper blinds because it came to her attention that "others were concerned" about the newspapers and she was not ready to decide on permanent window fixtures.

Appellant's evidence of their move-in date included a receipt for rental of a U-Haul on December 7, 2014, a date-stamped photograph of relatives dismantling a large bed frame to get it through the door, and the testimony of Wong's cousin and uncle, who helped with the move. Lam testified that their Comcast account was transferred from

---

[2] DeLisi and Pitre testified that the newspaper came down in August 2015, and Wong testified that it came down "a year ago," which would have been August 2015. Wong also testified, however, that appellants lived in the apartment with newspaper on the windows for "[a]lmost a year," and Randt testified that a photograph of the windows covered with newspaper was sent to him by a friend in November 2015.

4

11th Avenue to Balboa the day they moved in, and a friend of Wong's brother who moved into the 11th Avenue apartment appellants vacated, testified that he did so on December 15, 2014.

Other evidence appellants presented to show they were living in unit 2 included Lam telling the tenants they could leave rent checks on the door of the apartment instead of mailing them, and DeLisi paying her rent this way after December 2014. Lam signed for a Christmas card Randt sent by registered mail to the Balboa unit (which Randt acknowledged doing as a test, to see if anyone would sign for it). Lam described a time in March 2015, when he "ran down" and moved his car in response to a text from DeLisi and Pitre saying the car was blocking their garage; on April 7, Lam received a text from DeLisi about Pitre being locked out of their apartment, but by the time Lam received the text, it had "sorted itself out." Lam testified that his car was registered in January 2015 with the Balboa address. A photograph showed Wong inside unit 2, taking a photograph of herself in a bridesmaid's dress for a January 2015 wedding. Uber receipts showed that Lam was picked up from 4441 Balboa at 5:30 or 6:00 a.m. on March 24, 2015, to go to the San Francisco International Airport, and picked up from the airport at 11:21 p.m. on April 3, 2015, and taken to 4441 Balboa. A May 30, 2015 receipt showed a ride leaving San Carlos Airport at 10:00 a.m. and arriving at Balboa Street at 10:35 a.m.

Randt testified that after moving out of unit 2, he passed by on his way to visit friends, surf, or go to businesses he continued to frequent, and noticed that his old apartment "sat vacated," with newspaper on the windows. This made him feel disheartened at first, then infuriated, as he felt he had been "taken advantage of."

DeLisi, whose unit was across the hall from unit 2, testified that she did not see anyone living in unit 2 during the first half of 2015. She did not hear any sounds from the apartment or see lights in the living room area, but a light in the pantry was always on, "24/7." DeLisi testified that she saw Lam around the building a few times a month but did not see Wong much, and that she occasionally saw Lam walking his dog but never heard him inside the residence or saw the garage door for the unit being opened and closed. Pitre testified that he "knew" defendants were not living at 4441 Balboa during

5

the first six months of 2015. He rarely saw Wong at the property and would see Lam "checking on things," sometimes with an older gentleman, and occasionally walking the dog late at night, but not staying overnight. Randt, and others who had lived in the building or visited, testified that sounds such as voices from other apartments could be heard easily from inside an apartment and in the hallway.[3]

DeLisi and Pitre moved out of unit 1 on July 19, 2016. DeLisi testified she would have continued living in the Balboa apartment for at least 10 years; Pitre had planned to stay at Balboa for at least five to ten years. They moved to a one-bedroom apartment in Alameda, where the monthly rent was $1950. The apartment complex had a pool and a gym, and their commute for work in Oakland would be shorter than it was from San Francisco.

Lam testified the subject of Jordan Wong moving into 4441 Balboa came up after Jordan lost his job in early 2015; they had a "casual conversation" about it in February or March and a few conversations over the course of two months, some with Wong's girlfriend, Danilee Boozer, present. They did not discuss how much rent he would pay.

Jordan Wong and Boozer moved into unit 1 at Balboa Street on Sunday August 1, 2016. He had started working as the chef at a restaurant in the Marina and he planned to live at Balboa Street "[a]s long as I can, a minimum of three years." Boozer was about to

---

[3] Randt testified that within the building, one could hear sounds from other apartments like dogs and people talking, even snoring and coughing; from the hallway, one could hear the showers in the apartments. A friend of Randt's who had lived in unit 1 until 2012, testified that he could hear raised voices in other apartments, people coming and going, garage doors opening and closing, and dogs barking. Another friend of Randt's who spent a lot of time at Randt's apartment testified that he could hear voices from other apartments from Randt's unit.

Some of appellants' testimony appeared to offer explanations why they were not seen or heard much at the building. For example, Lam testified that after moving into unit 2, when he and Wong were both going to be out, they took their dog to Wong's parents' house for dogsitting. They ate dinner at Wong's parents' house "almost every other night" and visited there as "pretty much a daily routine." At home, they had a rule that people were to take off their shoes inside the unit. Both Lam and Wong testified that they tried to keep their dog away from DeLisi and Pitre's dog.

start a full time job with the San Francisco Unified School District, a 15-minute drive from the Balboa apartment, that she planned to keep for a long time.

Jordan Wong testified that he had not discussed with Lam whether he would be paying rent but expected he "probably" would. Asked whether he knew prior to July 15, 2015, that his name had been put on a document as part of a relative move-in eviction, Jordan Wong replied, "I don't know, I just thought [Lam] and the lawyers would take care of this." He had never been in unit 1 prior to the date Lam served the relative move-in notice and in his October 2015 deposition had said he did not know anything about unit 1, its layout, how many bedrooms it had or when he would be moving into it. In an April 2016 deposition, Wong had stated that he and Boozer had discussed moving to San Luis Obispo, where he had "a pretty solid job opportunity out there possibly in the near future," or to the Caribbean. Jordan Wong testified that he had enjoyed living in the apartment in the Sunset where he and Boozer previously lived, which had a "sunset view," was a rent-controlled apartment and had parking. As of April 2016, Boozer did not know what the rent would be at Balboa, whether it was subject to rent control or whether she would have parking.

The jury's special verdict as to DeLisi found, as to the Rent Ordinance, that appellants did *not* seek to recover possession of unit 1 in good faith, without ulterior reasons, and with honest intent, for Jordan Wong's use or occupancy as his principal residence for a period of at least 36 continuous months, and that appellants acted in knowing violation or reckless disregard of the Rent Ordinance when they sought to recover possession of the apartment. The jury also found in DeLisi's favor on the causes of action for interference with the quiet use and enjoyment of the apartment, bad faith under the Rent Ordinance, and intentional misrepresentation. With respect to intentional infliction of emotional distress, the jury found that appellants' conduct was not outrageous. The jury found economic damages of $110,000, plus 10,000 for past mental or emotional damages, for a total of $120,000. Damages were trebled pursuant to the Rent Ordinance, resulting in a judgment in favor of DeLisi for $360,000.

7

Appellants moved for a new trial and for judgment notwithstanding the verdict, both of which motions were denied. The court awarded DeLisi $93,557.19 in attorney fees and $8,893.43 in costs, and filed an amended judgment in her favor in the amount of $462,450.62.

**DISCUSSION**

Appellants contend that the relative move-in provisions of the Rent Ordinance are unconstitutionally vague, that there was no substantial evidence they violated the Rent Ordinance, that respondents' other causes of action fail because they were based on the same facts, that all respondents' claims were protected by the litigation privilege, and that the damages award was not based on "actual damages" as required by the Rent Ordinance, was not supported by substantial evidence, and violated appellants' substantive due process rights.

**I.**

As they did in the trial court, appellants contend that the entire action against them was barred by the litigation privilege.[4] (Civ. Code, § 47, subd. (b)(2).) "With the 'principal purpose' of affording litigants and witnesses 'the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions,' the privilege 'applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.' (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212–213.) 'The privilege "is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057.)' (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241 (*Action Apartment Assn.*).)" (*Strawn v. Morris Polich & Purdy, LLP* (2019) 30

---

[4] Appellants argued in their trial brief that all the claims against them should be dismissed due to the litigation privilege, argued the point in a verbal motion for a directed verdict, sought jury instructions on the issue, and raised the issue again in a motion for judgment notwithstanding the verdict.

Cal.App.5th 1087, 1094 (*Strawn*).) " 'A prelitigation communication is privileged only when it relates to litigation that is contemplated in good faith and under serious consideration.' (*Action Apartment Assn., supra*, 41 Cal.4th at p. 1251.) 'Whether a prelitigation communication relates to litigation that is contemplated in good faith and under serious consideration is an issue of fact.' (*Ibid.*)" (*Strawn,* at p. 1095.)

The premise of appellants' argument is that all of DeLisi's claims rested on appellants' service of the 60-day notice of termination, which they argue was a "legal notice" necessarily subject to the litigation privilege. Appellants argue that the notice was served by a process server and on its face contemplated litigation, stating "If you have not vacated the subject premises as of 60 days from the date of service of this notice upon you, a lawsuit will be brought against you for possession of said premises." Appellants point out that they did in fact bring an unlawful detainer action when DeLisi failed to vacate the apartment. In their view, these facts amount to undisputed evidence that the 60-day notice was served in serious contemplation of litigation.

The trial court disagreed, stating that "the only testimony on this, on the intent of the eviction notice, was not for purposes of litigation, but was to evict the tenants. And that's what even [appellants' attorney] said in his testimony. . . . There has been no evidence presented that defensive privilege applies. Defensive privilege would only apply if there was evidence of the purpose of the eviction notices being in connection with litigation or pre-litigation. . . . [T]here's been no evidence whatsoever, not even a shred of evidence that the eviction notices were for the purposes of litigation or intent of litigation."

Whether the litigation privilege applies to a notice of eviction is a question of fact. (*Action Apartment Assn., supra,* 41 Cal.4th at p. 1252.) Unlike the actual filing of a legal action, such as an action for unlawful detainer, "which by its very nature is a communicative act . . . clearly protected by the litigation privilege," . . . [¶] [a] notice of eviction is a communication regarding prospective litigation, and, as such, it is not necessarily part of a judicial proceeding." (*Id.* at pp. 1249–1250.) The question is whether " 'imminent litigation was seriously proposed and actually contemplated in good

9

faith as a means of resolving the dispute between [the parties].' " (*Action Apartment Assn.*, at pp. 1251–1252, quoting *Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1381.) " ' "[B]ecause the privilege does not attach prior to the actual filing of a lawsuit unless and until litigation is seriously proposed *in good faith* for the purpose of resolving the dispute, even a threat to commence litigation will be insufficient to trigger application of the privilege if it is actually made as a means of inducing settlement of a claim, and not in good faith contemplation of a lawsuit." ' " (*Strawn, supra,* 30 Cal.App.5th at p. 1096.) A landlord filing an eviction notice with no intent to proceed to litigation has been noted as an example of a situation in which the litigation privilege would *not* apply. (*Rental Housing Assn. of Northern Alameda County v. City of Oakland* (2009) 171 Cal.App.4th 741, 767 (*Rental Housing*).)

The trial court found that the only evidence on the issue demonstrated that the notice of termination was served in order to evict DeLisi, not to institute litigation. Appellants, in effect, maintain that an eviction notice *always* comes within the protection of the litigation privilege because it contains a threat to sue. But such a threat might be no more than an attempt to induce the tenant's compliance or set the stage for a settlement resulting in such compliance. The evidence here showed no existing dispute between the parties at the time the notice was served, and no reason appellants necessarily would have expected a need for litigation to implement the eviction.[5] As

---

[5] We held in *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1488 (*Feldman*)*,* that an eviction notice was protected by the litigation privilege, noting that the notice to quit was "promptly" followed with an unlawful detainer action and was "clearly connected to and logically related to" that action. (*Ibid.*) That case differs factually from the present one. The landlord in *Feldman* claimed the tenants had not been properly approved as subtenants, and the notice was served after the tenants were informed that they were occupying the premises unlawfully and would have to leave or pay an additional $2,000 rent, and otherwise threatened by the landlord's agent. (*Id.* at p. 1474.) Those facts showed an existing dispute between the parties that the landlord clearly intended to resolve by resort to a legal action. Here, appellants sought to replace DeLisi as a tenant by means of a relative move in, which was certainly within their legal rights but DeLisi later claimed it was done in violation of the Rent Ordinance. There was no previous discussion of the subject, and appellants had no reason to know how DeLisi

proponents of the affirmative defense, it was appellants' burden to establish the applicability of the litigation privilege. (*Peregrine Funding, Inc. v. Sheppard, Mullin, Richter & Hampton* (2005) 133 Cal.App.4th 658, 676.) They did not do so. To accept appellants' position would be tantamount to saying that a landlord who serves an eviction notice can never be sued for unlawfully terminating the tenancy. We decline to take this step.

## II.

Appellants challenge the relative move-in provisions of the Rent Ordinance as unconstitutionally vague, claiming the terms used to describe the required state of mind for a landlord evicting a tenant are vague and internally inconsistent, and therefore failed to provide fair notice of the proscribed conduct. " 'The standard for unconstitutional vagueness is whether the statute "provide[s] a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." ' [Citations]. 'A law is unconstitutionally vague if it fails to meet two basic requirements: (1) The regulations must be sufficiently definite to provide fair notice of the conduct proscribed; and (2) the regulations must provide sufficiently definite standards of application to prevent arbitrary and discriminatory enforcement.' [Citations].' ' "Only a reasonable degree of certainty is required, however." [Citation]. If a reasonable and practical construction can be given, the law

would respond at the point they served the eviction notice. Appellants' unlawful detainer action was filed after DeLisi filed her suit against appellants.

More important than these factual differences, however, the issue arose in *Feldman* as the tenants, suing for wrongful eviction and other claims, attempted to resist the landlord's anti-SLAPP motion by showing that they had a "probability of prevailing on their claims" after the landlord had shown that the claims arose from protected activity. (*Feldman, supra,* 160 Cal.App.4th. at p 1477.) We held that the landlord established that the eviction notice was within the litigation privilege and the tenants, who never contended the notice was an empty threat, "failed to demonstrate prima facie that they could overcome the litigation privilege." (*Id.* at p. 1488.) We did not hold that an eviction notice *always* comes within the privilege. The present case does not involve an anti-SLAPP motion, and it was not DeLisi's burden to demonstrate the litigation privilege did *not* apply.

11

will not be held void for uncertainty.' [Citation]." (*Larson v. City and County of San Francisco* (2011) 192 Cal.App.4th 1263, 1288–1289.)

Under section 37.9, subdivision (a)(8)(ii), of the Rent Ordinance, "[a] landlord shall not endeavor to recover possession of a rental unit unless: [¶] . . . [¶] [t]he landlord seeks to recover possession in good faith, without ulterior reasons and with honest intent; [¶] . . . [¶] [f]or the use or occupancy of the landlord's grandparents, grandchildren, parents, children, brother or sister, or the landlord's spouse or the spouses of such relations, as their principal place of residency for a period of at least 36 months, in the same building in which the landlord resides as his or her principal place of residency . . . ." The relative move-in must be the landlord's "dominant motive for recovering possession." (S.F. Admin. Code, § 37.9, subd. (c).)

Appellants argue that the state of mind requirements in these provisions allow tenants and juries to look behind landlords' compliance with the relative move-in provisions to decide, based on guesses about the landlords' motivations, whether they really acted for the right reasons, and to hold landlords liable for having "bad thoughts" even though their actions otherwise satisfy the requirements of the ordinance. As a result, they maintain, the state of mind provisions " 'impermissibly delegate[] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.' [Citations.]" (*Cranston v. City of Richmond* (1985) 40 Cal.3d 755, 763.)[6]

---

[6] Appellants also contend the state of mind requirements are internally inconsistent in that they require landlords to act "without ulterior reasons," which the owners take to mean without *any* reason other than wanting a relative to move into the unit, but also require that the relative move-in be the "dominant motive," which suggests there may be other reasons as long as they are secondary. This, appellants argue, means juries " 'must necessarily guess at [the provisions'] meaning and differ as to its application.' [Citation.]" (*Ortiz v. Lyon Management Group, Inc.* (2007) 157 Cal.App.4th 604, 619, overruled on other grounds in *Connor v. First Student, Inc.* (2019) 5 Cal.5th 1026, 1038.)

In the present case, however, the jury was not required to resolve any such inconsistency. The first question on the special verdict asked whether the owners sought to recover possession of DeLisi's apartment "in good faith, without ulterior reasons and

12

The trial court, relying upon *Rental Housing*, found the "motive" requirements of San Francisco Administrative Code section 37.9, subdivision (a)(8) constitutionally valid. *Rental Housing* addressed provisions of an Oakland rent control ordinance that, like the Rent Ordinance, required that a landlord not endeavor to recover possession of a rental unit unless at least one of the grounds enumerated in the ordinance is the landlord's "dominant motive," the landlord acts "in good faith" in seeking to recover possession, and the landlord proves he or she seeks to recover possession "with good faith, honest intent, and no ulterior motive. . . ." (*Rental Housing*, at p. 759.) Landlords challenging the ordinance argued that these provisions were preempted by Code of Civil Procedure section 1161, which defines unlawful detainer, because they restrict evictions authorized by state law. Rejecting this argument, *Rental Housing* stated: "The City argues the ' "good faith" requirement is crucial to the main purpose of the Ordinance: to prevent landlords from evicting in order to undermine rent control.' The Supreme Court made clear in *Birkenfeld* [*v. City of Berkeley* (1976) 17 Cal.3d 129] that substantive limitations on eviction that are imposed by local ordinance do not conflict with the procedural purpose served by the unlawful detainer statutes. (*Birkenfeld,* . . . at p. 149.) The requirements of good faith and proper motive imposed by the Ordinance are indeed substantive limitations on eviction that are permissible under *Birkenfeld* and are not procedural mechanisms that would be preempted by the unlawful detainer statutes." (*Rental Housing,* at p. 759.)

*Rental Housing* did not directly address the claim the owners make here, that the state of mind requirements are unconstitutionally vague. In our view, however, the import of the terms is clear: The stated ground for the eviction must in fact be the actual

with honest intent, for Jordan Wong's use or occupancy as his principal residence for a period of at least 36 continuous months." The second question asked whether it was the owners' "dominant motive" to seek recovery of the unit for this purpose. The instructions directed the jury to skip the second question if it answered "no" to the first. Since the jury answered the first question "no," it was not asked to, and did not, reach a decision on the issue of "dominant motive."

13

reason the landlord is seeking possession of the unit and not a pretext for some other motivation.

Appellants' arguments demonstrate their concern is not that they did not understand the requirements of the Rent Ordinance but that the state of mind requirements allowed their lives to be "put under a microscope" to enable the jury to determine their true motivations. This is not an issue of constitutional vagueness, but rather a potential consequence of any requirement that a landlord act in good faith.

For example, appellants argue that tenants should not be able to use evidence of landlords' daily activities to challenge the validity of an owner or relative move-in, only evidence of wrongful acts, and that amendments to the Rent Ordinance after trial demonstrate that the proof must be more objectively wrongful than anything the tenants presented here. At the time appellants served the eviction notice on DeLisi, the only elaboration in the Rent Ordinance regarding the state of mind requirements for an owner or relative move-in was in San Francisco Administrative Code section 37.9, subdivision (a)(8)(v): "It shall be rebuttably presumed that the landlord has not acted in good faith if the landlord or relative for whom the tenant was evicted does not move into the rental unit within three months and occupy said unit as that person's principal residence for a minimum of 36 continuous months." As amended in 2017, this subdivision now provides examples of what might show an absence of good faith: "Evidence that the landlord has not acted in good faith may include, but is not limited to, any of the following: (1) the landlord has failed to file the notice to vacate with the Rent Board as required by Section 37.9(c), (2) the landlord or relative for whom the tenant was evicted did not move into the rental unit within three months after the landlord recovered possession and then occupy said unit as that person's principal residence for a minimum of 36 consecutive months, (3) the landlord or relative for whom the tenant was evicted lacks a legitimate, bona fide reason for not moving into the unit within three months after the recovery of possession and/or then occupying said unit as that person's principal residence for a minimum of 36 consecutive months, (4) the landlord did not file a statement of occupancy with the Rent Board as required by Section 37.9(a)(8)(vii), (5) the landlord violated Section 37.9B by

14

renting the unit to a new tenant at a rent greater than that which would have been the rent had the tenant who had been required to vacate remained in continuous occupancy and the rental unit remained subject to this Chapter 37, and (6) such other factors as a court or the Rent Board may deem relevant. Nothing in this Section 37.9(a)(8)(v) is intended to alter or diminish any other right to relief that a tenant may have based on a landlord's failure to comply with this Chapter 37." (S.F. Ord. No. 160-17, eff. Aug. 27, 2017 (S.F. Ord. No. 160-17).)

Appellants argue that the amended ordinance "implicitly confirms" the prior one was vague, and that the newly delineated items "are entirely focused on the landlords' compliance with the technical steps of the [Rent Ordinance]," "have nothing to do with the intimate details of how landlords live their lives," and do not "permit a negative inference based on the possibility that relative move-in could result in a long-term increase in the property value, or on the landlords' decisions to legally increase a tenant's rent or serve a notice to quit for failure to pay rent." The amended ordinance, however, makes clear that the listed examples are not exhaustive: "Evidence that the landlord has not acted in good faith *may include, but is not limited to*" the stated factors, and includes *"such other factors as a court or the Rent Board may deem relevant."* (S.F. Ord. No. 160-17.)

Good faith, or its absence, is generally determined from the surrounding circumstances. (*Janise v. Bryan* (1948) 89 Cal.App.2d Supp. 933, 940 ["When the landlord's good faith is in issue, the court may inquire into all the relevant surrounding circumstances."]; *Bumgarner v. Orton* (1944) 63 Cal.App.2d Supp. 841, 844 [in owner move-in, "[o]n the issue of good faith, it is proper for the court to consider all the facts and circumstances which the owner appears to have regarded as important in forming his desire to occupy the housing accommodations himself"]; see *Freeman v. Vista de Santa Barbara Associates LP* (2012) 207 Cal.App.4th 791, 799 [good faith effort to sell mobile home shown by owner placing "for sale" sign in window, fielding calls from interested people, receiving offer with deposit, and walkthrough of property by real estate agents].) The point of the DeLisi's case was that although Jordan Wong moved into the apartment

from which DeLisi and Pitre were evicted, appellants' having him do so was pretextual in that appellants' true intent was not to have Jordan Wong live in the apartment for at least three years but to get rid of DeLisi and Pitre in order to subsequently increase the rent on the unit.

Requirements of good faith and proper motive are "substantive limitations on eviction." (*Rental Housing, supra,*171 Cal.App.4th at p. 759.) If evidence of the absence of good faith was limited to acts in violation of the Rent Ordinance such as those enumerated in provisions (1) through (5) of the amended ordinance described above, there would be little need for the Rent Ordinance to include a good faith requirement. Appellants' argument that they were improperly punished for having a wrongful mental state despite *not* having committed any wrongful or prohibited act ignores the obvious fact that the Rent Ordinance's good faith and proper motive requirements are substantive elements of the ordinance that, when absent, make wrongful conduct that might otherwise comply with the ordinance.[7]

Appellants argue that the "vague" state of mind provisions of the Rent Ordinance allowed DeLisi to argue that the jury should "assume" appellants were motivated by profit because of the nature of the San Francisco real estate market, despite the absence of evidence that appellants actually had a "plan to increase the building's value." But the nature of the real estate market is an undeniable fact of which owners, tenants and jurors in San Francisco can be assumed to be aware; indeed, the nature of the rental market

---

[7] Appellants attempt to distinguish *Larson, supra,* 192 Cal.App.4th 1263, which rejected a vagueness challenge to a provision of the Rent Ordinance prohibiting influencing or attempting to influence a tenant to vacate a rental unit "through fraud, intimidation or coercion," because "there is a social consensus as to the kind of conduct that is 'intimidating' or 'coercive.'" (*Id.* at pp. 1285, 1289.) Appellants argue that the provision at issue in *Larson* identified prohibited *actions* whereas the state of mind provisions they challenge here permitted them to be found liable based solely on "wrongful 'mental state,'" not because they committed any wrongful or prohibited act." This characterization is not accurate. The wrongful or prohibited act is evicting a tenant without good faith, honest reliance upon a stated reason that would be permissible *if* done in good faith and with honest intent.

16

necessarily enhances the significance of the protections and restrictions contained in the Rent Ordinance. " '*Regulating the grounds for eviction is integral to the success of the statutory framework, because the Rent Ordinance permits unlimited rent increases whenever a rental unit becomes vacant.* (Rent Ord., § 37.3.) As soon as an original tenant no longer permanently resides in a rental unit, the rent for that unit is temporarily decontrolled, allowing the landlord to boost the rent as high as the market permits. Once the unit is re-rented, it again becomes subject to the Rent Ordinance under a regulatory concept known as "vacancy decontrol/recontrol." Under this framework, governing the grounds for eviction is essential to the successful implementation of the Rent Ordinance, lest landlords circumvent the rent limitations by expelling tenants in order to raise rents. To prevent this activity, section 37.9 of the Rent Ordinance enumerates the acceptable grounds for tenant eviction.' " (*Foster v. Britton* (2015) 242 Cal.App.4th 920, 935.) DeLisi's attorney pointed to facts from which he asked the jury to *infer* that the owners acted with the intent to increase the value of their investment, such as that the first tenant to be evicted, Randt, paid the lowest rent and DeLisi paid the next-lowest, and that the circumstances suggested Jordan Wong's move into unit 1 was contrived rather than a considered decision for purposes unrelated to getting rid of the existing tenants. These were permissible arguments based on circumstantial evidence, which appellants were free to counter—as they did, for example, with testimony as to why Randt's particular unit was the one they wanted to move into themselves.

## III.

Appellants also argue that the jury's verdict cannot be sustained because there was no substantial evidence that they did not live in the Balboa building at the time they served the notice of eviction on DeLisi or that they did not seek possession of unit 1 for Jordan Wong to use as his primary residence for at least 36 months.[8] With respect to the

---

[8] DeLisi's two theories for how appellants violated the Rent Ordinance were that they did not live in the building when they served notice of the relative move-in eviction, as required by the Rent Ordinance, and that they did not pursue the eviction in "good faith, without ulterior reasons and with honest intent" for Jordan Wong to occupy as his

former, they point out that they presented photographic evidence of moving their bed into the unit on December 7, 2014, and testimony from the relatives who helped them move; evidence that they transferred their internet service to the unit as of December 7, 2014, and the PG&E bill for the unit was in their name; photographs of Wong in the unit in January 2015, and explanations for why newspaper remained on the windows of the unit for so long. By contrast, they maintain that DeLisi's attorney's argument that they lived elsewhere was based only on speculation, not evidence. For example, DeLisi's counsel pointed out that appellants both said they wanted to live near family, but the 11th Avenue apartment was closer to Wong's parents' house than the Balboa building and Wong's parents' house had an in-law unit, that they were using Wong's parents' address as their mailing address in November 2014, that they retained a parking space and key fob for the building at Folsom Street and Lam continued to use it as the address for some of his mail, that DeLisi and Pitre did not see or hear the owners around the building much until the fall of 2015, in a building where sounds were readily heard between the apartments, and that it was not reasonable to think appellants lived with newspaper on the windows for many months. Additionally, appellants argue that DeLisi's counsel improperly

principal place of residency for at least 36 months. Appellants argue that although the jury's verdict does not specify the basis of its decision in DeLisi's favor, it can be inferred that the verdict probably rested on the state of mind provisions because the jury found in favor of appellants in Randt's case. The verdict in Randt's case included findings that appellants sought to recover possession of Randt's unit in good faith, without ulterior reasons and with honest intent, to use as their principal residence, which appellants take to suggest that the jury found they did move into the building and, therefore, that the verdict in DeLisi's favor must have been based on the owners' mental state with respect to the relative move-in.

Clearly, the jury's verdict rested at least in part on appellants' state of mind: The special verdict specifically asked whether appellants sought to recover possession of DeLisi's unit "in good faith, without ulterior reasons and with honest intent, for Jordan Wong's use or occupancy as his principal residence for a period of at least 36 continuous months." The verdict does not indicate whether the jury *also* found that the owners did not live in the unit at the time they served the eviction notice, and the verdict in Randt's case does not necessarily reflect any determination of exactly *when* appellants moved into the building so as to indicate that the jury did not rely upon the timing issue with respect to DeLisi's eviction.

18

suggested to the jury that appellants had the burden of proving they lived in the unit—stating in closing argument that the owners should have produced more evidence on this point—whereas in fact it was DeLisi's burden to prove the owners were *not* living in the unit.

With respect to state of mind, appellants argue that the tenants produced no evidence the owners had a plan to do anything other than move into unit 2 themselves and have Jordan Wong and Boozer move into unit 1. Instead, according to appellants, the DeLisi's attorney speculated that appellants' true motive in evicting them was to increase the investment value of the building; improperly portrayed the owners' legal acts of raising DeLisi's rent and serving a notice to quit when she failed to pay her October rent as evidence of the alleged ulterior motivation; and speculated that having Jordan Wong move into unit 1 was a scam based on the fact that the owners did not have sufficient discussion with Wong about the move.

Appellants' argument ignores the fact that most of what they deem speculation by the tenants' attorney was simply argument based on possible inferences from the evidence. DeLisi and Petri testified that for the first six months of 2015, they did not see or hear any of the indications of habitation to be expected from neighbors living just across the hall, and their testimony was supported by other witnesses' descriptions of how easy it was to hear sounds between apartments in this building. To be sure, the jury could not reasonably have believed this testimony without disbelieving the owners' testimony and that of their witnesses. But that means only that the point was disputed, not that DeLisi's and Pitre's testimony did not constitute substantial evidence. Similarly, that appellants provided an explanation for having their windows covered in newspaper does not mean the evidence that the windows were covered with newspaper for almost a year could not support an inference that the unit was not being used as the owners' primary residence. The special verdict did not ask the jury to make a finding as to whether appellants lived in the building when they served the notice of eviction for unit 1, but the jury was instructed that the Rent Ordinance requires a landlord seeking

19

possession for a relative move-in to be residing in the building as his or her principal place of residence.

As to appellants' intentions in having Jordan Wong move into unit 1, the tenants' evidence certainly supported inferences that the move-in—although it indisputably occurred—was not sought in good faith within the meaning of the Rent Ordinance. The evidence showed that Jordan Wong vacated a rent-controlled apartment with parking, where he enjoyed living  to move into one he had never seen, with no agreement as to how much rent he would be paying, after a few casual conversations with Lam. Asked how long he intended to live in the Balboa Street apartment, Jordan Wong said "at least three years"—precisely the amount of time required by the Rent Ordinance. Counsel's suggestion that these facts suggested the relative move-in eviction was contrived was a commonsense inference to be drawn from evidence, depending on its evaluation of the witnesses' credibility. To be sure, as appellants suggest, Jordan Wong could simply have wanted to live in the building with his sister's family and therefore been uninterested in the details commonly investigated by a person moving to a new home. It was for the jury to determine whether, at the time appellants served notice of the relative move-in eviction, they did so with an honest, good faith intention to enable Jordan Wong to make the apartment his primary residence or contrived to have him move in as a means to terminate DeLisi's rent-controlled tenancy.

**IV.**

Under section 37.9, subdivision (f), of the Rent Ordinance, when a landlord "wrongfully endeavors to recover possession or recovers possession of a rental unit in violation of Section 37.9 and/or 37.10A," tenants may bring a civil action for "injunctive relief, money damages of not less than three times *actual damages* (including damages for mental or emotional distress as specified below), and whatever other relief the court deems appropriate." (Italics added.) Appellants argue that the jury's award was not supported by substantial evidence and bore no relationship to DeLisi's actual losses.

The jury was presented with two different theories as to how the DeLisi's damages should be measured. The tenants' expert witness, economist Richard Devine, viewed

20

DeLisi's damages for loss of her rent-controlled apartment as the difference between the stabilized rent she would have paid for the expected duration of her tenancy and the market rent for the unit from which she was displaced. Devine considered this "rent differential" an asset because the rent-controlled apartment gave DeLisi the economic benefit of paying rent in an amount considerably below market value.

Devine based his opinion of fair market value on data from a real estate reporting service that surveys rental rates in San Francisco and his own experience in real estate finance and development, considering size, location, and amenities; he had not been inside the Balboa units but had seen photographs and discussed the units with the tenants. He opined that the fair market value of the Balboa units in 2016 was $3,400 per month. Devine calculated that the annual rent-controlled rent for unit 1 in 2016-2017 would have been $18,257 and the market rate $40,800, a differential of $22,543. Over a period of five years, the differential would be $130,625, and over a 10-year period it would be $314,180; discounted to present value at the time of trial, the value of the rent-controlled tenancy over a period of 10 years would be $287,683. He did not consider the rent DeLisi was paying in her new apartment because it was not relevant to what he understood to be the proper measure of damages.

Appellants' presented two expert witnesses. Residential real estate appraiser Brian Grey performed two rental surveys comparing the Balboa units with comparable rentals, having inspected unit 2 and been told that unit 1 was a mirror image of unit 2 in its pre-renovation configuration, with older materials and finishes. Grey opined that the market rental value of unit 2 in September 2014, and the market value of each unit in June 2016 was $2700.

Economist Eric Drabkin disagreed with Devine's analysis of economic damages because the tenants did not "lose" the amount of money reflected by the differential Devine calculated, they only lost the opportunity to save that amount of money; in his view, the value of the rent-controlled tenancy was not an asset the tenants could monetize. Drabkin analyzed the tenants' damages by looking at the additional expenses they incurred "due to the alleged bad act." He testified that DeLisi did not incur past

21

economic damages because she had only just moved out at the time of trial, and that her future economic damages would be the amount she was out-of-pocket beyond what she would have been if she had stayed in the Balboa apartment. This included moving expenses, the difference between her monthly rent at Balboa and her monthly rent at her new apartment, and any differences in expenses for items such as commuting to work. Drabkin calculated that with the annual increase permitted by the Rent Ordinance, at the time of trial DeLisi would have been paying $1,493 at Balboa. She was paying $1,950 for her new apartment in Alameda, a monthly difference of $457, but because she worked in Oakland, she would save on tolls for commuting to work in an amount Drabkin calculated to be $93 per month. Drabkin determined that DeLisi's out-of-pocket losses for the first year came to $4,125 and would be $23,139 for a five-year period and $48,183 for a 10-year period. He took into consideration that, to his knowledge, DeLisi's rent in Alameda was not rent-controlled.

Appellants argue that Devine's rent differential analysis did not measure DeLisi's actual damages but rather the amount appellants could gain by evicting her and replacing her with a tenant paying market rent. In appellants' view, the only appropriate measure of DeLisi's damages is her out-of-pocket losses.

The Rent Ordinance does not expressly limit damages to out-of-pocket losses; it refers to "actual damages" without further elaboration. " 'Damages' are monetary compensation for loss or harm suffered by a person, or certain to be suffered in the future, as the result of the unlawful act or omission of another. ([Civ. Code,] §§ 3281-3283.) 'Actual' is defined as 'existing in fact or reality,' as contrasted with 'potential' or 'hypothetical,' and as distinguished from 'apparent' or 'nominal.' (Webster's Third New Internat. Dict. (1964) p. 22.) It follows that 'actual damages' are those which compensate someone for the harm from which he or she has been proven to currently suffer or from which the evidence shows he or she is certain to suffer in the future. They are to be distinguished from those which are nominal rather than substantial, exemplary or punitive rather than compensatory, and speculative rather than existing or certain. (*Beeman v. Burling* (1990) 216 Cal.App.3d 1586, 1601, fn. 9; Black's Law Dict. (6th ed. 1990)

22

pp. 35 & 390; and cf. *Weaver v. Bank of America* (1963) 59 Cal.2d 428, 437 [not speculative or punitive].)  In short, ' " '[a]ctual damages' is a term synonymous with compensatory damages . . . ." ' (*Weaver*, at p. 437; *Balmoral Hotel Tenants Assn. v. Lee* (1990) 226 Cal.App.3d 686, 689.)"  (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1543–1544.)  " '[A]ctual damages consist of both general and special damages.' (Black's Law Dict. (5th ed. 1979).)"  (*Beeman,* at p. 1601.)

Appellants argue there is no persuasive precedent upholding the rent differential measure of damages, and a case invalidating a provision of the Rent Ordinance requiring landlords to make rent differential payments to displaced tenants shows that rent differential is a "subsidy for the tenant unrelated to the tenant's new costs or actual damages."  *Coyne v. City and County of San Francisco* (2017) 9 Cal.App.5th 1215, 1219-1220 (*Coyne*)*,* rejected imposition of "rent differential" payments on landlords, viewing such payments as rent subsidies.  But *Coyne* did not involve any question about damages for a wrongful eviction.  The issue in that case was a provision of the Rent Ordinance requiring a landlord who evicts a tenant under the Ellis Act (Gov. Code, § 7060 et seq.) to pay two years' worth of "rent differential" between the rent-controlled price of the unit and the market price.  The Ellis Act protects residential landlords' right to go out of business.  (*Coyne*, at p. 1218.)  *Coyne* held that the provisions of the Rent Ordinance requiring rent differential payments were preempted by the Ellis Act because they imposed a "prohibitive price" on landlords' exercise of their rights under the Ellis Act. (*Coyne*, at pp. 1226–1227.)  While the Ellis Act permits cities to mitigate the adverse impacts of landlords' removal of residential units from the market, the court explained, rent differential payments were not directed at impacts such as the need to pay first and last months' rent and a security deposit on a replacement rental or moving expenses but rather were " 'explicitly implemented to subsidize the payment of rent that a displaced tenant will face on the open market, regardless of income' " (*Coyne*, at p. 1227), and imposed a condition not found in the Ellis Act. (*Coyne*, at pp. 1229–1230.)

Unlike the situation in *Coyne,* damages a landlord is required to pay as a result of evicting a tenant in violation of the Rent Ordinance do not impose any condition on the

23

landlord's exercise of a protected right. The fact that rent differential payments a landlord is required to make to tenants displaced by the landlord's exercise of his or her right to remove residential units from the market may properly be characterized as subsidies says nothing about whether rent differential is a reasonable measure of a wrongfully displaced tenant's actual damages.

Appellants point out that while this court affirmed a tenant's wrongful eviction judgment that used rent differential as the measure of damages in *Chacon v. Litke* (2010) 181 Cal.App.4th 1234, 1245–1246, the method of calculating damages was not raised as an issue on appeal and we offered no opinion on it.

In *Castillo v. Friedman* (1987) 197 Cal.App.3d Supp. 6, 21, the appellate division of the superior court upheld the trial court's use of the rent differential calculation as the appropriate measure of damages for a wrongful eviction. Appellants dismiss *Castillo* as a case from the appellate division of the superior court rather than the Court of Appeal, and as not involving "a statute that limits a plaintiff's recovery to 'actual damages.' " These distinctions are not particularly persuasive. Published decisions of the superior court appellate division have precedential value. And, as we have seen, "actual damages" are simply compensatory damages, as opposed to nominal, exemplary or speculative. (*Saunders v. Taylor, supra,* 42 Cal.App.4th at pp. 1543–1544; *Beeman v. Burling, supra,* 216 Cal.App.3d at p. 1601, fn. 9 (*Beeman*).)

Appellants acknowledge that an unpublished federal court decision accepted rent differential as the measure of damages, although it found the evidence of market rent for the unit insufficient to prove the damages in that case (*Cummings v. Hale* (N.D. Cal., May 17, 2017, No. 15-CV-04723-JCS) 2017 WL 3669622 at *17), but they dismiss this case as relying solely upon *Chacon* and *Castillo.*

Appellants asked the trial court to rule on which measure of damages it would allow rather than allowing both to be presented to the jury. Declining to do so, the trial court noted that the ordinance referred to "actual damages" rather than "out-of-pocket" losses, and ruled that it was for the jury, not the court, to decide between the competing

24

expert witnesses' views as to the appropriate measure of what the tenants had lost with respect to rent.

We agree. "[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. . . . [¶] But courts must also be cautious in excluding expert testimony. The trial court's gatekeeping role does not involve choosing between competing expert opinions." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771–772.) The question for the jury was what amount of damages would compensate DeLisi for what she lost with respect to rent expenses by being evicted from the rent-controlled apartment. The expert testimony that appellants challenge was not speculative; it was simply based on a different set of assumptions than those employed by appellants' expert. This was pointed out to the jury in argument: Appellants' attorney argued in closing that the tenants' rent differential theory of damages was hypothetical, based on a financial benefit that was not an asset the tenants could sell or cash they would receive, and asked the jury to instead look only at DeLisi's out-of-pocket loss due to the eviction.[9]

Appellants further argue that the damage award, trebled pursuant to the Rent Ordinance, violated their substantive due process rights. *Balmoral Hotel Assn. v. Lee, supra,* 226 Cal.App.3d at pages 692, 697 (*Balmoral*), construed the phrase "actual damages" in a prior version of the Rent Ordinance that did not expressly refer to damages for mental suffering as not including such damages, due to risk that awards of trebled damages for mental suffering would violate landlords' substantive due process rights. *Balmoral* recognized that interpreting "actual damages" to include damages for emotional anguish was "consistent with accepted legal usage," as "the phrase 'actual damages' is ordinarily synonymous with compensatory damages which may include damages for

---

[9] In the end, the jury's award was an amount greater than the 10-year total computed by appellants' expert and less than Devine's calculation for a five-year period.

mental suffering." (*Id.* at p. 689.) But the court found the phrase ambiguous because other provisions in the ordinance used "actual" in its lay meaning, as a restrictive modifier in phrases like "actual expenses" and "actual costs," suggesting an interpretation of "actual damages" as "damages that are capable of exact measurement and proof," "presumably limited to economic losses." (*Id.* at p. 690.) *Balmoral* also found that "[a]n interpretation of 'actual damages' as referring narrowly to out-of-pocket expenses [was] most consistent with the legislative purpose underlying the treble damage provision of the section" (*ibid.*), which is "to provide sufficient economic incentive for aggrieved persons to bring suit" and not to punish wrongdoing. (*Balmoral,* at p. 695 & fn. 4; *Kelly v. Yee* (1989) 213 Cal.App.3d 336, 341.)

Having found the phrase "actual damages" ambiguous, the *Balmoral* court construed it as excluding damages for mental suffering in order to avoid the "serious issues of substantive due process" that would arise from mandatory trebling of damages for mental suffering. (*Balmoral, supra,* 226 Cal.App.3d at pp. 689, 691–692, 697.) The problem with mandatory trebling of these damages, *Balmoral* explained, was that "multiplication of such damages may serve to magnify—by a factor of three—the uncertainties already present in the determination of the damages," as "appropriate compensation for mental anguish cannot be determined by any objective standard capable of consistent and predictable application." (*Id.* at p. 694.) Considering that the purpose of the treble damage provision in the Rent Ordinance was "to provide sufficient economic incentive for aggrieved persons to bring suit" in cases "involving claims that are ordinarily small in amount," the court found that trebling damages for mental anguish was not reasonably related to the legislative purpose: "It is obvious that the trebling of damages for mental anguish may sometimes produce awards that soar far beyond the measure needed to economically justify tenants in pursuing claims against their landlord. No doubt the chance of securing a windfall judgment might provide some incentive for

26

representing low-income tenants, but such an aleatory incentive is offensive to the policy of equal justice." (*Balmoral,* at p. 695.)[10]

*Balmoral* is not directly on point: We are not concerned with damages for emotional distress (which the Rent Ordinance now expressly includes within the "actual damages recoverable under section 37.9, subdivision (f)), but with how to measure a form of economic damage. Appellants argue, however, that use of the rent differential analysis presents a problem analogous to that discussed in *Balmoral* because rent differential damages are uncertain in that they are "untethered from the tenant's actual damages," the trebling "results in an unforeseeable, unconstitutionally excessive penalty," an award based on rent differential would in itself be ample to justify the cost of bringing suit, and trebling the award "dwarfs" DeLisi's out-of-pocket damages and constitutes a windfall. Appellants argue that while the purpose of the trebling provision is not to punish but to provide justification for the cost of suit, the trebled award exceeds the " 'due process norm' of '3 or 4 to 1' " applicable to punitive damage awards, as it is 14 times larger than DeLisi's out-of-pocket losses over five years and 6.8 times larger than her 10-year out-of-pocket losses. (See *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1182 [awards of punitive damages significantly exceeding single digit ratio to compensatory damages constitutionally suspect]; *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 718 [ratio as low as one to one may be constitutional maximum where compensatory damages award is substantial].)

Damages for losses related to rent measured by the differential analysis are not uncertain in the way or to the same degree as damages for emotional distress. "The

_____

[10] *Balmoral* disagreed with our decision in *Beeman, supra,* 216 Cal.App.3d 1586, which held that damages for mental suffering were included in "actual damages" under the Rent Ordinance based on the legal definition of "actual damages." *Beeman* upheld an award that included damages for mental suffering and was trebled pursuant to the requirement of section 37.9, subdivision (f). The Rent Ordinance now includes damages for "mental or emotional distress" in "actual damages," but provides that damages for mental or emotional distress are to be trebled only "if the trier of fact finds that the landlord acted in knowing violation of or in reckless disregard of Section 37.7 or 37.10A herein." (S.F. Admin. Code, § 37.9, subd. (f).)

appropriate compensation for mental anguish cannot be determined by any objective standard capable of consistent and predictable application.  'In a very real sense, the jury is asked to evaluate in terms of money a detriment for which monetary compensation cannot be ascertained with any demonstrable accuracy.  As one writer on the subject has said, "Translating pain and anguish into dollars can, at best, be only an arbitrary allowance, and not a process of measurement, and consequently the judge can, in his instructions, give the jury no standard to go by; he can only tell them to allow such amount as in their discretion they may consider reasonable . . . . " ' " (*Balmoral, supra,* 226 Cal.App.3d at p. 694.)

Rent differential damages, by contrast, can be directly calculated based on the tenants' rent at the time of eviction, the market value of rent for the unit and the expected duration of the tenancy.  Appellants argue that this measure of damages is based on experts' guesses as to market rent and speculation as to rates of increase and expected duration of a tenancy, rendering rent differential damages "arbitrary or incapable of being ascertained with any demonstrable accuracy"  and therefore unconstitutional under *Balmoral.*  To be sure, experts may disagree on a variable like market value rent; here, there was a $700 difference between appellants' expert's opinion of market value monthly rent in 2016 ($2,700) and the tenants' expert's opinion ($3,400).  But each variable in the rent differential analysis is quantifiable based on articulable criteria and data.  Here, the jury was informed of the sources of information upon which each of the experts relied, factors they considered and methods they used in reaching their opinions, and therefore could evaluate the competing opinions, and it could assess the credibility of the tenants' testimony.  Similar uncertainties are faced by defendants in cases where damages will be determined by competing opinions as to plaintiffs' future medical expenses or earning capacity.  Rent differential damages do not involve a jury in assigning a monetary value to an unquantifiable injury.

Appellants' argument that the trebled award of rent differential damages provided DeLisi with a windfall she could not have received if she had been able to obtain punitive damages is based on their faulty premise that the only permissible measure of "actual

28

losses" with respect to rent is out-of-pocket losses. Rent differential damages compensate for an actual economic loss—the loss of a specific rent-controlled tenancy. The rent differential amount may be considerably greater than the tenants' out-of-pocket losses if, as here, the tenants' new rent is not far in excess of the rent-controlled amount they had been paying and the market value of the vacated unit has risen significantly. This is a function of the underlying theories of compensation, rent differential focusing on the loss of the tenancy, including factors such as location and amenities, while out-of-pocket loss focuses narrowly on the tenant's changed expenses. DeLisi moved to a lower cost area: The disparity between the methods of calculating damages might have been much smaller if DeLisi had moved to another apartment in the same area as the one from which she was evicted rather than moving out of San Francisco, as her new rent would likely have been more comparable to the market value of the Balboa apartment. The disparity might also be smaller for a tenant who had not lived long in the rent-controlled unit, bringing the stabilized rent closer to market value, or in a market where rents had not risen significantly over the period of the rent-controlled tenancy. These potential differences in outcome do not render rent differential an invalid means of calculating damages; as the trial court pointed out, the Rent Ordinance does not limit "actual damages" to "out-of-pocket loss." Rent differential and out-of-pocket loss are both calculable forms of compensation, and the parties are free to argue that one or the other is more appropriate in a given case, as they did here.

Finally, appellants argue that trebling a damage award that is based on rent differential results in a penalty far more severe than is necessary to serve the purpose of providing incentive for suits to enforce the Rent Ordinance. (*Balmoral, supra,* 226 Cal.App.3d at p. 690; *Kelly v. Yee, supra,* 213 Cal.App.3d at p. 341.) "While the courts have invalidated statutory penalties which are 'wholly disproportionate to any discernible and legitimate legislative goal,' we know of no authority holding that treble damages are constitutionally defective. (Cf. *Hale v. Morgan* (1978) 22 Cal.3d 388, 397–399.)"

29

(*Kelly*, at p. 342.)[11]  In finding that trebling an award of damages for emotional distress was not reasonably related to the governmental purpose of providing aggrieved tenants sufficient economic incentive to challenge violations of the Rent Ordinance, *Balmoral* was concerned with the "windfall" of fortuitous awards that could "soar far beyond the measure needed to economically justify tenants in pursuing claims against their landlord." (*Balmoral*, at p. 695.)  Rent differential damages, as we have said, are not standardless or unpredictable.  We find no basis for holding the award in the present case constitutionally infirm.[12]

## DISPOSITION

The judgment is affirmed.

Costs to respondents DeLisi and Pitre.

---

[11] *Hale* found that imposition of a $100 per day statutory penalty for willfully turning off the utilities of a tenant with intent to evict was unconstitutional as applied. The court described the operation of the penalty as "mandatory, mechanical, potentially limitless in its effect regardless of circumstance, and capable of serious abuse."[11] (*Hale v. Morgan, supra,* 22 Cal.3d at p. 404.)  On the particular facts in that case, the accumulated penalties were such that the plaintiff, who had initially moved a mobile home into the defendant's mobile home park without the defendant's knowledge or permission and subsequently failed to pay the rent he negotiated, "may well end up owning the park or a substantial equity therein as a consequence of the application of [the statute] to defendant's conduct." (*Id*. at pp. 404–405.)  The court concluded that this "confiscatory result" was "wholly disproportionate to any discernable and legitimate legislative goal" and "clearly unfair." (*Ibid*.)

[12] Anticipating reversal of the judgment, in whole or as to damages, appellants also seek reversal of the award of attorney fees and costs.  As they advance no argument in support of reversing the award absent reversal of the judgment as to liability or damages, we have no occasion to review the award of attorney fees and costs.

_____
Kline, P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.


*DeLisi et al. v. Lam et al.* (A151014)

31

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| NICOLE DELISI et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>COLLIN LAM et al.,<br><br>    Defendants and Appellants. | A151014<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-15-547092)<br><br>**ORDER CERTIFYING OPINION<br>FOR PARTIAL PUBLICATION** |

**BY THE COURT:**

The opinion in the above-entitled matter filed on August 7, 2019, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be partially published and it is so ordered.

Dated: _____ _____

                                                  Kline, P.J            .

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.

Trial Court:                San Francisco County Superior Court

Trial Judge:                Hon. Angela Bradstreet


Attorneys for Appellant:    Horvitz & Levy
                            Mitchell C. Tilner
                            Allison W. Meredith

                            Stratman Patterson & Hunter
                            Edward J. Rodzewich

Attorneys for Respondent:   Mark Hooshmand
                            Idin Kashefipour